473 A.2d 40

John Wesley CUNNINGHAM, Jr.

v.

STATE of Maryland.

No. 543 Sept. Term, 1983.

Court of Special Appeals of Maryland.

April 5, 1984.

Certiorari Denied July 13, 1984.

**250**

Robert L. Pierson, Assigned Public Defender, with whom were Alan H. Murrell, Public Defender, and W. Michael Pierson, Assigned Public Defender, on the brief, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty., for Baltimore City and Ruth Finch, Asst. State's Atty. for Baltimore City, on the brief, for appellee.

Argued Before MOYLAN, LOWE and GETTY, JJ.

MOYLAN, Judge.

The appellant, John Wesley Cunningham, Jr., was convicted by a Baltimore City jury, presided over by Judge Elsbeth

Levy Bothe, of both second-degree murder and the use of a handgun in the commission of a crime of violence.

Upon this appeal, he raises seven contentions:

1. That the trial judge erred in refusing to instruct the jury on the doctrine of imperfect self-defense;
2. That the trial judge erroneously instructed the jury on the crime of manslaughter;
3. That the trial judge erroneously declined to instruct the jury that it could not convict on the uncorroborated testimony of an accomplice;
4. That the trial judge erroneously failed to suppress the appellant's inculpatory statement;
5. That the trial judge erroneously disallowed evidence of the deceased's reputation and prior relationship with the appellant;
6. That the trial judge erroneously instructed the jury that it could not impose the death penalty; and
7. That the trial judge erroneously failed to instruct the jury as to the significance of the deceased's prior acts.

### Imperfect Self-Defense

The doctrine of imperfect self-defense is of recent origin, and scholars of the law have referred to it as "not yet far advanced." W. LaFave and A. Scott, *Criminal Law* (1972), § 77. The growing recognition of this mitigating element in homicide law, a mitigation that when present will reduce murder to manslaughter, was well summarized for this Court by Judge Orth (sitting on special assignment) in *Faulkner v. State*, 54 Md.App. 113, 114–115, 458 A.2d 81 (1983):

> "From the turbulent waters of the criminal law of Maryland, roiled by the dictates of *Mullaney v. Wilbur*, [421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508], ... emerged an esoteric qualification to the doctrine of self-defense, known as the 'imperfect right of self-defense.' We noticed it in *Evans v. State* [28 Md.App. 640, 349 A.2d 300], ... recognized it in *Shuck v. State*, ... mentioned it in

*Wentworth v. State,* . . . and applied it in *Law v. State* . . . ." (Citations omitted).

We have noticed recently a trend on the part of the defense bar to invoke this esoteric doctrine with inappropriate and promiscuous frequency. A brief revisiting of the doctrine appears called for. The various grades of felonious homicide are but efforts by the law to recognize, for purposes of assessing appropriate punishment, different levels of blameworthiness. Professor Perkins was one of the first to analyze manslaughter as a "catch-all" concept embracing a wide and miscellaneous variety of felonious homicides that in terms of blameworthiness are "neither murder nor innocent." After discussing the oldest and most common form of legally recognized mitigation—the Rule of Provocation—he went on at R. Perkins, *Criminal Law* (2d ed. 1969) 69–70, to discuss "Mitigation Other Than Provocation":

"Since manslaughter is a 'catch-all' concept, covering all homicides which are neither murder nor innocent, it logically includes some killings involving other types of mitigation, and such is the rule of the common law. For example, if one man kills another intentionally, under circumstances beyond the scope of innocent homicide, the facts may come so close to justification or excuse that the killing will be classed as voluntary manslaughter rather than murder. 'It is not always necessary to show that the killing was done in the heat of passion, to reduce the crime to manslaughter;' said the Arkansas court, 'for, where the killing was done because the slayer believes that he is in great danger, but the facts do not warrant such a belief, it may be murder or manslaughter according to the circumstances, even though there be no passion.' To give another illustration, the intentional taking of human life to prevent crime may fall a little short of complete justification or excuse and still be without malice aforethought."

The salutary ameliorating purpose of this emerging body of doctrine is not to extenuate deliberately culpable behavior, but only to recognize certain errors in judgment as extenuating factors. With the exception of imperfect du-

ress, which is a law unto itself, *Wentworth v. State,* 29 Md.App. 110, 349 A.2d 421 (1975), the other varieties of imperfect defense all deal with subjectively honest, but objectively unreasonable, assessments of necessity in the closely related settings of imperfect self-defense, *Faulkner v. State, supra;* imperfect defense of others, *Shuck v. State,* 29 Md.App. 33, 349 A.2d 378 (1975); and imperfect defense of habitation. *Law v. State,* 29 Md.App. 457, 349 A.2d 295 (1975). This particular aspect of *mens rea,* however, is not all there is to these various mitigating defenses and this is the thing that the appellant here overlooks.

In a strained, if not indeed cynical, version of the facts most favorable to himself, the appellant stretches to assert some reason to believe, even unreasonably, that he feared for his life when he shot his victim. The appellant, resentful and angry over having had his Moped taken from him earlier in the day by the ultimate homicide victim, rallied his supporters over a period of several hours, armed himself with a loaded gun, gathered his courage at his grandmother's house while testing the gun, and ultimately went looking for the victim. As he approached the victim, the appellant drew the gun from a bag and ordered a group of bystanders to move out of the way. Even the appellant's best version of the facts only has the victim leaning on the Moped and "putting his hands by his pants." From this the appellant allegedly concluded that the victim "was apparently grabbing for something." The appellant stated that from this skimpy predicate, he was "afraid that he would be killed" and assumed that his victim had "a gun or something." He now boldly asserts that his own testimony as to his own subjective belief is sufficient to establish, if not an objectively reasonable belief in the necessity to kill, then at least an unreasonable belief in that necessity. This, he claims, entitled him to a jury instruction on the esoteric theory of "imperfect self-defense."

The appellant's mistake is to look at a single element of the defense in a vacuum. Imperfect self-defense, of course, stands in the shadow of perfect self-defense. If the appel-

lant's belief, reasonable or unreasonable, in the necessity to kill to preserve his own life is but one of the elements as to which he has the burden of producing a *prima facie* case in order to generate a genuine jury question, even a reasonable belief in the necessity to kill, would, standing alone, avail him naught. LaFave and Scott, *Criminal Law* discusses another of the limitations on the self-defense doctrine, at 394–395:

> "It is generally said that one who is the aggressor in an encounter with another—i.e., one who brings about the difficulty with the other—may not avail himself of the defense of self-defense. Ordinarily, this is certainly a correct statement, since the aggressor's victim, defending himself against the aggressor, is using lawful, not unlawful, force; and the force defended against must be unlawful force, for self-defense."

The exemption from the foreclosing effect of being the aggressor is unavailing to the appellant here. It is first required that he be a nondeadly aggressor (the appellant here advanced with a loaded gun). It is additionally required that the aggressor be one "who in good faith effectively withdraws from any further encounter with his victim (and to make an effective withdrawal he must notify the victim, or at least take reasonable steps to notify him)." *Id.* at 395. (The appellant here made no effort to withdraw from the encounter he had brought on.) As an aspect of this last requirement, the law universally imposes upon the original aggressor the duty to seize upon any opportunity to retreat.

In discussing voluntary manslaughter generally and the "Imperfect Right of Self-Defense" specifically, LaFave and Scott, *Criminal Law,* at 583, makes it indisputably clear that the reasonableness of the killer's belief is but one of the two elements that would be necessary to establish a perfect defense of self-defense:

> "In order for a killer to have a 'perfect' defense of self-defense to homicide, (1) *he must be free from fault in bringing on the difficulty with his adversary; and* (2) he

must reasonably believe (though he need not correctly believe) both (a) that his adversary will, unless forcibly prevented, immediately inflict upon him a fatal or serious bodily injury, and (b) that he must use deadly force upon the adversary to prevent him from inflicting such an injury. If one who is not the aggressor kills his adversary with these two actual and reasonable beliefs in his mind, his homicide is justified, and he is guilty of no crime—not murder, not manslaughter, but no crime." (Emphasis supplied).

An aggressor, faced even with the reasonable belief in the necessity to kill, "cannot have the defense of self-defense, for that requires *both freedom from fault in the inception of the difficulty and the entertainment of beliefs which are reasonable." Ibid.* (Emphasis supplied).

It is clear that the discussion of imperfect self-defense in *Faulkner v. State, supra,* was in the context of the mental element of belief in the necessity to kill—a reasonable belief for total exculpation or an honest, albeit unreasonable, belief for mitigation:

"Perfect self-defense requires not only that the killer subjectively believed that his actions were necessary for his safety but, objectively, that a reasonable man would so consider them. Imperfect self-defense, however, requires no more than a subjective honest belief on the part of the killer that his actions were necessary for his safety, even though, on an objective appraisal by a reasonable man, they would not be found to be so." 54 Md.App. at 115, 458 A.2d 81.

Similarly, *Shuck v. State, supra,* dealt with a situation where the companion, on whose behalf the defendant intervened, was "neither an aggressor nor a mutual combatant. He was under unprovoked attack from at least one and possibly two persons. Under the circumstances, the appellant was entitled to intervene in defense of his friend." 29 Md.App. at 41–42, 349 A.2d 378.

■ In the present case, it is clear that the appellant did not meet his burden of production to generate a genuine jury issue as to imperfect self-defense. Even crediting his strained and implausible assertion as to his thought process as enough to generate an honest, though unreasonable, belief that he was in deadly peril, all of the testimony establishes unequivocally that the appellant was the aggressor and there was no shred of evidence to indicate otherwise.[1] The very notion that, failing to establish a perfect component of a defense for purposes of total exculpation, the lesser establishment of that component in imperfect form may nonetheless argue for mitigation, is a notion that presupposes the establishment of all of the other elements that are necessary to comprise the defense. If a defense requires proof of A, B, and C, proving half of C for mitigation rather than all of C for exculpation, still presupposes the proof of A and B. Absent proof of A and B, whatever happens to C, in whole or in part, is utterly immaterial. Although as a lesser defense, the partial proof of an element may still stand as a pale reflection of the fuller proof of that element, it can never forgive the total failure of proof as to other necessary elements. The appellant here would have his partial proof of one component of self-defense divert attention from his utter failure to produce even a *prima facie* case as to the other necessary element.

This is the psychological key to why this increasingly popular contention has appeared to be more perplexing than it should be. Fixating on the defensive element that fails of proof only partially, we tend subconsciously to overlook other defensive elements that fail of proof totally, which failures would, if noticed, be dispositive. There was in this case no adequate support in the evidence to generate a genuine jury issue as to self-defense, perfect or imperfect.

---

1. *It is unnecessary for us even to address the issue of whether the imperfect defense would lie where the fully proved and partially proved elements of the perfect defense were reversed—where the defendant was at fault in bringing on the difficulty but where his subsequent perception of mortal danger was absolutely reasonable.*

The instruction the appellant sought in this regard, therefore, was properly denied.

### Hot-Blooded Provocation

■ One of the appellant's complaints is that on several occasions, an erroneous instruction was given on the subject of manslaughter. Granting for sake of argument that the instructions may have been a bit muddled, the point is immaterial, for the appellant was in no event entitled to an instruction on the subject of manslaughter. We have already discussed the unavailability of any theory of manslaughter based upon imperfect self-defense. Similarly, the evidence in the case simply would not, as a matter of law, support any theory of manslaughter based upon hot-blooded provocation. In *Whitehead v. State,* 9 Md.App. 7, 10–11, 262 A.2d 316 (1970), Judge Orth set out fully the elements of provocation:

> "[T]here may be a homicide which would otherwise be murder which is reduced to manslaughter by circumstances of alleviation or mitigation. Such a case is where the circumstances surrounding the homicide establish that it was provoked. For the 'Rule of Provocation' to be invoked there are four requirements:
>
> (1) There must have been adequate provocation;
>
> (2) The killing must have been in the heat of passion;
>
> (3) It must have been a sudden heat of passion—that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;
>
> (4) There must have been a causal connection between the provocation, the passion, and the fatal act."

Against these bench marks, we will now measure the evidence at hand.

The appellant failed to establish a *prima facie* case of hot-blooded provocation with respect to at least two of the necessary four elements. Either failure would be fatal to his theory of mitigation. The evidence in this case was such

that even granting an initial provocation, there was "a reasonable opportunity for the passion to cool." We discussed this element of provocation in *Tripp v. State,* 36 Md.App. 459, 470, 374 A.2d 384 (1977), "We are here concerned with the objective test of whether there had been a sufficient cooling time for the passions of an average and reasonable man to abate." We further explained, at 36 Md.App. 471–472, 374 A.2d 384:

> "The law, in its wisdom, extenuates certain killings by lowering the degree of blameworthiness because it recognizes human frailty when one is in the clutches of blind and sudden fury. The long-smoldering grudge, by way of contrast, may be psychologically just as compelling a force as the sudden impulse but it, unlike the impulse, is a telltale characteristic of premeditation. The law extenuates certain killings not simply because they have been provoked but because there has also been the lack of time between the provoking cause and the impulsive response to think about the consequences or the alternatives. In the case of the spontaneous explosion, reason has no opportunity to intervene; in the case of the 'slow burn,' it has."

*See also Bartram v. State,* 33 Md.App. 115, 175–177, 364 A.2d 1119 (1976), *aff'd* 280 Md. 616, 374 A.2d 1144 (1977).

The appellant has, moreover, failed utterly to meet his burden of production with respect to any "causal connection" between the arguable provocation and arguable passion, on the one hand, and the fatal act, on the other hand. As observed in this regard in *Bartram v. State, supra,* at 33 Md.App. 175, 364 A.2d 1119, "The blood, however, must indeed be hot and, generally speaking, only the hot-blooded killer can attest to that." The appellant here took the stand in his own defense and testified unequivocally that he shot the victim not in hot-blooded rage, but because he feared that if he did not kill in self-defense, he would be killed or grievously wounded himself. His abject failure to provide evidence of hot-blooded motivation, as to which he was the best if not exclusive source, is as fatal here as was a similar

failure to provide such indispensable evidence in *Bartram v. State:*

"In the circumstances of this case, only the appellant could have injected evidence as to an intentional but hot-blooded killing. She, however, stoutly maintained that the killing was suicidal." 33 Md.App. at 175, 364 A.2d 1119.

■ Where the facts do not support a theory of manslaughter, no instruction in that regard need be given. *Blackwell v. State,* 278 Md. 466, 476–478, 365 A.2d 545 (1976), *cert. denied* 431 U.S. 918, 97 S.Ct. 2183, 53 L.Ed.2d 229 (1977); *Tripp v. State, supra.*

### The Other Contentions

■ The other contentions will not detain us long. One of these is that Judge Bothe erroneously refused to instruct the jury, after having been requested to do so, that it could not convict the appellant on the uncorroborated testimony of the alleged accomplice, Kirk Johnson. The contention is ridiculous. The corroboration requirement looks simply to the need of nonaccomplice testimony either to place the accused with other perpetrators of the crime or to show the accused's involvement in the crime itself. *Brown v. State,* 281 Md. 241, 378 A.2d 1104 (1977). In this case, three disinterested witnesses observed the fatal shooting at firsthand and, as prior acquaintances of both the appellant and his victim, established his homicidal agency unequivocally. Even that undisputed corroboration is on the facts of this case really beside the point. The appellant himself not only gave an extrajudicial statement, which was introduced into evidence, acknowledging his homicidal agency, but took the stand and swore to that very fact. He testified under oath that he was at the crime scene, that he went there to look for the victim, that he pointed the gun at the victim and that he shot the victim dead. His defense was simply that he shot in self-defense. The corroboration requirement, therefore, simply has nothing to do with any issue in the case.

■ The appellant also complains that his extrajudicial statement to the police should not have been received in evidence. The contention once again smacks of opportunism. The appellant's version of the killing in his statement paralleled in every significant regard his testimony from the stand. In view of the massive and undisputed evidence establishing him as the homicidal agent, moreover, his version of the shooting was the only thing that gave him an arguable defense.

He was interrogated by Detective Harry Edgerton. He acknowledges having received full *Miranda* warnings and having signed a waiver. He alleges no threats, promises, or inducements on the part of Detective Edgerton. He claims rather that at one point, Edgerton left the room for three or four minutes. During that interval, the appellant was alone with a Sergeant Landsman, who allegedly induced the appellant to give a statement with blandishments of cooperation on the subject of bail. What clearly emerges from the transcript of the suppression hearing is that Judge Bothe simply did not believe the appellant and put no credence in anything he said. The appellant leaps upon *Streams v. State,* 238 Md. 278, 208 A.2d 614 (1965), however, and argues that the failure to call Sergeant Landsman to the stand was fatal. We are not so persuaded. Notwithstanding the failure of the State to bring in Sergeant Landsman to rebut the claim of inducement directly, the claim was adequately refuted indirectly. *Price v. State,* 261 Md. 573, 277 A.2d 256 (1971); *Ponds v. State,* 25 Md.App. 162, 165–67, 335 A.2d 162 (1975). The appellant himself places the brief absence of Detective Edgerton from the room and the solitary inducement on the part of Sergeant Landsman at a time after the *Miranda* waiver had been signed and after the formal taking of the statement had begun.

Although Detective Edgerton had acknowledged the possibility of a brief absence from the room at an earlier time, his testimony supported a finding that he was present at all times on an uninterrupted basis after the formal taking of the statement had begun. He testified further that no

inducement was made by him or anyone else while he was so present. His testimony, therefore, although it did not refute the possibility of Sergeant Landsman having been alone with the appellant *on some occasion,* did refute the possibility of Sergeant Landsman having been alone with the appellant during the critical time testified to explicitly by the appellant.

■ The appellant complains that Judge Bothe abused her discretion in disallowing defense testimony from one Laverne Jones. Ms. Jones' testimony, however, went back to a time when the appellant was 12 years of age and played on a baseball team coached by Ms. Jones. Ms. Jones had not seen the appellant or the victim for three or four years prior to the homicide and knew nothing about their relationship during the immediately preceding year. Her testimony was that back when the appellant was 12 years old, the victim had hit him and was, therefore, thrown off the baseball team. We agree with Judge Bothe that this testimony was as to an event so remote as to bear no relevance to any issue in this case. Evidence of the deceased's "violent and dangerous character," moreover, would be as to an immaterial issue in this case, because of the failure of the appellant in other necessary regards to generate a genuine jury question as to perfect or imperfect self-defense, as fully discussed above. In any event, we see no abuse of discretion. *Connor v. State,* 225 Md. 543, 555–556, 171 A.2d 699 (1961), *cert. denied,* 368 U.S. 906, 82 S.Ct. 186, 7 L.Ed.2d 100 (1961).

■ The appellant complains that Judge Bothe twice erroneously informed the jury that this was not a capital case, once during *voir dire* examination and once in the course of counsel's closing argument. The short answer to the contention is that there was no defense objection to the jury ultimately impaneled and any possible complaints bearing on the *voir dire* examination were, therefore, waived. *Calhoun v. State,* 297 Md. 563, 578–580, 468 A.2d 45 (1983). As to the comment made in response to the State's closing

argument, there was no objection and there is nothing, therefore, preserved for appellate review. Md.Rule 1085.

■ The appellant's final contention is that Judge Bothe erroneously refused to instruct the jury concerning the appellant's prior acts of violence. As has already been fully discussed, the issue of self-defense, perfect or imperfect, was not properly in this case and the requested instruction, therefore, dealt with an issue that was utterly immaterial.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.

LOWE, Judge, concurring.

I concur in the result.