600 A.2d 904

Steven McKAY

v.

STATE of Maryland.

No. 285, Sept. Term, 1991.

Court of Special Appeals of Maryland.

Jan. 30, 1992.

Nancy S. Forster, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before FISCHER, DAVIS and MOTZ, JJ.

DAVIS, Judge.

The appellant, Steven McKay (McKay), appeals from his conviction in the Circuit Court for Baltimore City by a jury for the wounding of Michael Roth (Roth). The jury found McKay guilty of assault with intent to murder, use of a handgun in the commission of a crime of violence, and carrying a handgun. The trial judge sentenced McKay to a total of thirty-five years in prison.

## FACTS

On March 13, 1990, Baltimore City police arrested McKay and charged him with the shooting of Roth, a 28–year–old trim carpenter from Annapolis. The shooting occurred the previous night during an altercation between Roth and McKay outside the Sugar Shack Bar in South Baltimore. Roth sustained wounds to his right hand, right chest, and back. The gunshot wound to his back left him paralyzed.

Following a two day trial, which ended January 24, 1991, McKay, who was twenty-three at the time of trial, was convicted of assault with intent to murder, carrying a handgun, and using a handgun in the commission of a crime of violence. On February 26, 1991, the court heard arguments on McKay's motion for a new trial. Defense counsel argued that the trial judge's refusal to give a jury instruction about a hot-blooded response to legally adequate provocation deprived her client of an "adequate defense, because he had one-third of his defense cut out from under him." McKay's motion was denied, and he was sentenced to thirty-five years in prison.

The shooting occurred shortly before midnight on March 12, 1990, on East Patapsco Avenue in the Brooklyn section of South Baltimore. A witness at the scene told police the gunman's name was Steven McKay; and later at the hospital, Roth identified McKay from police photographs. Police recovered a black nine-shot .22 caliber handgun[1] from un-

---

1. Testimony revealed that the weapon was unregistered.

der a chair in the apartment where McKay was arrested the day after the shooting.

Two witnesses—Thomas Witte and Dana Schaech—testified that they saw McKay shoot Roth two times [2] following an affray between the two combatants. Testifying as a prosecution witness, Witte, who knew neither McKay nor Roth, said he was standing across the street from the Sugar Shack when he saw McKay leave the bar, followed closely by Roth, who shouted, "I know who you are." Witte told the court that Roth then "jumped on [the defendant] and started fighting with him." Roth admitted on the stand that he threw the first punch. Roth testified that he followed McKay from the bar because he believed McKay had stolen his carpentry tools several months earlier. Testimony revealed that, during the ensuing fight, Roth, who stood 6'1" and weighed 185 pounds, was the larger of the two men and that McKay was "taking a beating." Witte testified that Roth pounded McKay's head several times into metal steps along the sidewalk, though Roth denied this on the stand. When the brawl had lasted several minutes, McKay then reached into the waist of his pants, drew his revolver, and fired at Roth.[3] McKay ran from the scene but was arrested the following afternoon as he hunkered behind a sofa at an apartment. Roth, who was para-

---

**2.** Roth testified that three gunshots were fired.

**3.** The witnesses, including Roth and McKay, presented different versions of how the shooting actually occurred. Testimony differed as to whether the battling parties separated themselves moments before the shots were fired, as witnesses Witte and Schaech testified; whether they were separated by unnamed third parties, as Roth testified; or whether, as McKay testified, the men were still locked in combat when he fired the shots. Another significant divergence of testimony involves whether McKay shot Roth once, turned and took a few steps and turned and fired again, as Witte and Schaech testified; whether McKay fired two shots and turned and ran about 15 yards, only to run back, proclaiming, "Hell with this, I'm going to kill this son of a bitch," and fired a third time at the downed Roth, as Roth testified; or whether McKay fired blindly over his shoulder while pinned to the ground by the larger Roth, as McKay testified.

lyzed as a result of his wounds, underwent a hospital stay and months of rehabilitation.

On appeal, McKay challenges the trial judge's refusal to instruct the jury on the law of provocation. We believe the issues raised more precisely require us to answer the questions:

(1) What quantum of evidence is necessary to generate the issue of a hot-blooded response to legally adequate provocation requiring a jury instruction? and

(2) Is a defendant charged with assault with intent to murder precluded from asserting the defense that he acted in the heat of passion because he claims self-defense and his testimony indicated he acted out of fear?

We hold that, under the facts of this case, appellant was entitled to an instruction on a hot-blooded response to legally adequate provocation. We explain.

### DISCUSSION

#### I

#### Jury Instruction

■ The felony of assault with intent to murder is created by Maryland statute. Md.Ann.Code art. 27, § 12 (1957, 1987 Repl.Vol.). While the statute outlines the punishment,[4] the elements of the crime are defined by case law. In order to prove assault with intent to murder, the prosecution must prove that there was an assault and that it was done with the " '*specific intent to kill* under circumstances such that, if the victim had died, the offense would be murder.' " *Franklin v. State*, 319 Md. 116, 125–26, 571 A.2d 1208 (1990), quoting *State v. Jenkins*, 307 Md. 501, 515 A.2d 465 (1986) (emphasis added). *See Glenn v. State*, 68

---

4. "Every person convicted of the crime of an assault with intent to murder is guilty of a felony and shall be sentenced to imprisonment for not less than two years nor more than 30 years." Md.Ann.Code art. 27, § 12 (1957, 1987 Repl.Vol.).

Md.App. 379, 511 A.2d 1110, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986). "In short, assault with intent to murder possesses all the elements of murder saving the death of the victim." R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice and Procedure,* § 3.5, at 50 (1983 & Supp. 1988).

At trial, McKay's attorney contended that, under Maryland law, assault with intent to murder can be mitigated to simple assault upon a showing that the wounding was a hot-blooded response to legally adequate provocation, *i.e.*, a battery. Defense counsel requested that the jury be given an instruction as to legally adequate provocation, which would have allowed the jury to consider returning a guilty verdict on simple assault, a lesser charge. McKay's attorney made the following request of the court:

The third ground of argument that the defense is entitled to, because it's been generated by the evidence, is that this was a fight that was provoked by the victim, and that the shooting happened in the heat of passion before there was an opportunity to cool. That also would reduce assault with intent to murder to assault. That's why I'm requesting the instructions on self-defense, imperfect self-defense, and legally adequate provocation tied into what—a mitigation which would take something down from murder to manslaughter. We're taking it down from assault with intent to murder to assault, that the shooting occurred in the course of a fight before there was an opportunity to cool off. It reduces it from assault with intent to murder to simple assault.

The following colloquy thereafter followed between counsel and the court:

THE COURT: I'm not sure you're correct here. I'm not saying you're incorrect, but it would seem to me when you're in an affray or defending yourself, or whatever you're doing, that to pull out a gun or a lethal weapon, and as an impulsive thing, particularly when you're starting out having it kind of legally [sic] in the first place

gives me a little bit of trouble. I think if you're carrying a gun, you might be entitled to use it in—

[DEFENSE COUNSEL]: Well, Your Honor, the killing in a hot-blooded response is—

THE COURT: Well, I understand all about manslaughter where—

[DEFENSE COUNSEL]: Right, and there must be a provocation.

THE COURT: I'm not even sure if you shoot somebody—if you're carrying a gun unlawfully, of course, I don't see what defense you've got to that one, but if you're carrying a gun unlawfully and somebody attacks you and you react without thinking and you pull out your gun and shoot him dead, whether that makes it manslaughter, just because you didn't have time to come to your senses before you got your gun out—

[DEFENSE COUNSEL]: If it was because he called him a punk or something like that, I could agree, but when he's bashing his head into the side of the steps, I think we have legally adequate provocation and hot-blooded response.

THE COURT: This is a situation where the person who was defending himself or didn't provoke the fight or whatever was acting—

[DEFENSE COUNSEL]: In hot blood.

THE COURT:—In hot blood, and—and if your ability to kill is inspired by a hot-blooded situation which involves your ability to kill with a gun which you wouldn't ordinarily have, no matter how hot your blood became—

[DEFENSE COUNSEL]: It doesn't matter, Judge, the fact that he may be guilty of possessing a handgun has nothing at all, frankly, to do with whether he intended to kill Mr. Roth or not.

THE COURT: It does, because Mr. Roth—both of them would have walked away with something less than—

[DEFENSE COUNSEL]: That's your position. Our position is he would have been in shock trauma having

drains put in his head to release the swelling on his brain, because he would have been [sic] continued to have his head beat into the steps.

THE COURT: But in any event, the presence of the gun guaranteed that somebody was going—

[DEFENSE COUNSEL]: Well, if you refuse to give me the provocation, I'll just accept [sic], Judge, preserve it for appeal.

THE COURT: I'm not talking about provocation, because who started the affray was (inaudible).

The lower court refused to give the instruction on adequate provocation because the defendant was carrying the weapon illegally when the shooting occurred. The above excerpt of the proceedings indicates that the trial judge was preoccupied with the notion that, but for possession of the firearm, the hot blood would not have so gravely manifested itself; the injury, hence, would have been less severe and "you wouldn't ordinarily have, no matter how hot your blood became ... both of them would have walked away with something less." [5] Our review of the record of the proceedings compels us to reach the conclusion that there was evidence from which the jury could have found appellant acted in the heat of passion.

In *Whitehead v. State*, 9 Md.App. 7, 10–11, 262 A.2d 316 (1970), we stated that the four requirements of the "Rule of Provocation" are:

---

**5.** Our review of the record reveals a sufficient evidentiary predicate to warrant an instruction on whether appellant acted in the heat of passion in response to legally adequate provocation. We are precluded, however, from reviewing the trial court's assessment of the quantum of evidence before it since the refusal to give the instruction was based not on the determination that the issue had not been generated but rather on the court's rationale that "no matter how hot [his] blood became, both of them would have walked away with something less" (referring to the injuries sustained by the victim and the charges brought against the defendant). While the trial judge may have been correct in stating that the interjection of an illegally possessed firearm aggravated the situation, the law contemplates that the appellant answer for possessing the gun under a different charge. (See Md. Ann.Code art. 27, § 36B(b)).

(1) There must have been adequate provocation;

(2) The killing must have been in the heat of passion;

(3) It must have been a sudden heat of passion—that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;

(4) There must have been a causal connection between the provocation, the passion, and the fatal act.

The "Rule of Provocation" applies in situations involving the mitigation of murder to voluntary manslaughter and assault with intent to murder to assault. In order to qualify as "adequate provocation," the provocation must be " 'calculated to inflame the passion of a reasonable man and tend to cause him to act for the moment from passion rather than reason.' " *Girouard v. State*, 321 Md. 532, 539, 583 A.2d 718 (1991), quoting *Carter v. State*, 66 Md.App. 567, 572, 505 A.2d 545 (1986).

In the aftermath of the Supreme Court's decision in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), holding as unconstitutional any procedure which imposes upon an accused the burden of proof of any element of a crime, Judge Moylan, speaking for this Court in *Evans v. State*, 28 Md.App. 640, 723–24, 349 A.2d 300 (1975), *aff'd*, 278 Md. 197, 362 A.2d 629 (1976), quoting LaFave and Scott, *Criminal Law* (1972), said:

"As to the burden of production of evidence, it is uniformly held that the defendant is obliged to start matters off by putting in some evidence in support of his defense—e.g., evidence of his insanity, or of his acting in self-defense, or of one of the other affirmative defenses— *unless of course the prosecution, in presenting its own side of the case, puts in some evidence of a defense, in which case the matter of defense is properly an issue though the defendant himself produces nothing further to support it....* Perhaps experience might show that homicides and battery are, as often as not, committed in self-defense; but even if this is so, it would still be wise (in the interests of simplifying issues and saving time

which would be spent in presenting matters on which there is no dispute, and because the defendant normally has greater opportunity to know the facts) to place the burden of production on the defendant." [Emphasis supplied.]

While recognizing that, as a practical matter, it is usually the defendant who is in a superior position to generate the issue of self-defense or a hot-blooded response to legally adequate provocation, it is, of course, beyond cavil that such issues may be generated by the prosecution as well.

McKay's attorney requested a jury instruction on whether the evidence indicating adequate provocation existed sufficient to mitigate the charge against McKay from assault with intent to murder to simple assault. Maryland law provides that "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law...." Md.Rule 4–325(c) (1991). "The provisions of this rule are mandatory. The trial judge must instruct the jury on every essential point of law supported by the evidence when requested to do so." *Sangster v. State,* 70 Md.App. 456, 473, 521 A.2d 811 (1987), *aff'd,* 312 Md. 560, 541 A.2d 637 (1988).

If a defendant requests an instruction on the issue of mitigation, the defendant must present " 'some evidence' " of mitigating circumstances, such as heat of passion. *Dykes v. State,* 319 Md. 206, 215, 571 A.2d 1251 (1990), quoting *Simmons v. State,* 313 Md. 33, 39–40, 542 A.2d 1258 (1988). The law places upon the shoulders of the defendant the burden of producing mitigating evidence " 'sufficient to give rise to a jury issue.' " *Id.* " 'Once the issue has been generated by the evidence, however, the State must carry the ultimate burden of persuasion beyond a reasonable doubt on that issue.' " *Id. Dykes* dealt with the issue of self-defense; but, under the language of *Dykes* and earlier cases, the "some evidence" test applies to several mitigating defenses, including heat of passion. In defining "some evidence," the Court of Appeals said:

*Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

*Dykes*, 319 Md. at 216–17, 571 A.2d 1251.

■ As the Court held in *Dykes*, the determination of whether the evidence was sufficient to generate an issue requiring a jury instruction raises a question of law for the judge. *Id.* at 225, 571 A.2d 1251. The evidence clearly shows that the defendant successfully presented "some evidence" of heat of passion or hot blood sufficient to warrant an instruction to the jury on legally adequate provocation, even though the defendant's testimony focused on the theories of perfect self-defense and imperfect self-defense.

The Court of Appeals has said that, in satisfying the "some evidence" test, the "source of the evidence is immaterial. . . . If there is *any* evidence relied on by the defendant which, if believed, would support his claim . . . the defendant has met his burden." *Dykes*, 319 Md. at 217, 571 A.2d 1251 (emphasis supplied).

In *Glenn v. State, supra,* we reversed the conviction of a defendant who was convicted of assault with intent to murder after stabbing his victim four times. The facts of the case were as follows: The defendant was sitting in a car talking with a woman following a late-night concert when

the assault victim, Frank Rizo, walked up and told the defendant that "the lady did not want to be bothered any more." *Id.* at 406, 511 A.2d 1110. As the defendant alighted from the car, Rizo and his friends beat the defendant until bouncers from a nearby club chased them away. When Rizo drove off, the defendant gave pursuit in his car until the cars stopped at a red light. At this time, the defendant leaped from his car, went over to Rizo's car, and stabbed him four times. *Id.* at 407, 511 A.2d 1110. We held that the trial judge erred in convicting appellant for assault with intent to murder because the stabbing was a hot-blooded response to legally adequate provocation. We consequently remanded the case to the lower court for sentencing on simple assault.

In *Cunningham v. State*, 58 Md.App. 249, 259–60, 473 A.2d 40, *cert. denied*, 300 Md. 316, 477 A.2d 1195 (1984), we discussed our decision in *Bartram v. State*, 33 Md.App. 115, 175–77, 364 A.2d 1119, *aff'd*, 280 Md. 616, 374 A.2d 1144 (1977), wherein we considered the quantum of proof necessary to generate the issue of a hot-blooded response:

The appellant has, moreover, failed utterly to meet his burden of production with respect to any "causal connection" between the arguable provocation and arguable passion, on the one hand, and the fatal act, on the other hand. As observed in this regard in *Bartram v. State, supra,* at 33 Md.App. 175, 364 A.2d 1119, "The blood, however, must indeed be hot and, generally speaking, only the hot-blooded killer can attest to that." The appellant here took the stand in his own defense and testified unequivocally that he shot the victim not in hot-blooded rage, but because he feared that if he did not kill in self-defense, he would be killed or grievously wounded himself. His abject failure to provide evidence of hot-blooded motivation, as to which he was the best if not exclusive source, is as fatal here as was a similar failure to provide such indispensable evidence in *Bartram v. State:*

"In the circumstances of this case, only the appellant could have injected evidence as to an intentional but

hot-blooded killing. She, however, stoutly maintained that the killing was suicidal." 33 Md.App. at 175, 364 A.2d 1119.

Where the facts do not support a theory of manslaughter, no instruction in that regard need be given.

*Cunningham* involved an accused bent upon revenge in retaliation for having his moped taken from him earlier in the day by the victim; Cunningham "rallied his supporters over a period of several hours, armed himself with a loaded gun, gathered his courage at his grandmother's house while testing the gun, and ultimately went looking for the victim." 58 Md.App. at 254, 473 A.2d 40. He approached the victim, drew the gun from a bag, and ordered a group of bystanders to move out of the way, at which time, according to the defendant, the victim put his hands in his pants. We rejected Cunningham's claim that he had generated imperfect self-defense because all of the evidence showed he was the aggressor, and therefore an essential requirement of perfect and imperfect self-defense was missing. Additionally, one's subjective belief of imminent peril is best established by the accused.

There can be no question that where, as in *Bartram,* the accused claims to have acted in self-defense and there is no other evidence to support the assertion that he acted in the heat of passion, that he has acted in hot blood has not been generated. Indeed, the *Bartram* decision turned on the rather bizarre and stoutly maintained position taken by an accused (who had been forced to be a participant in sexual acts for years with her husband—the victim—and his mistress) that the bullet wound to the chest and two bullet wounds to the head were the result of suicide.

Our research uncovers no case which stands for the proposition that, simply because a defendant testifies he acted out of fear, he is thereby precluded from relying on the facts and circumstances as borne out by *all* of the evidence in the case which would support the assertion that he acted in the heat of passion. Decisions upholding the trial judge's refusal to grant a jury instruction generally

conclude that there is no evidentiary basis to warrant granting the instruction or a critical component of the factual predicate is lacking. *Bartram v. State, supra; Tripp v. State,* 36 Md.App. 459, 467–68, 374 A.2d 384 (1977) (where no causal connection between hot blood and provocation established); *Fisher v. State,* 28 Md.App. 243, 255, 345 A.2d 110 (1975) ("utterly no showing of inducement" to warrant instruction on entrapment); *Street v. State,* 26 Md.App. 336, 339, 338 A.2d 72 (1975) (insufficient evidence to warrant instruction on self-defense where evidence shows accused was in act of robbing victim and, hence, the aggressor); *Bateman v. State,* 10 Md.App. 630, 635, 272 A.2d 64 (1971) (insufficient evidence of intoxication to warrant instruction on defense of voluntary intoxication).

We hold that the defendant met his burden of presenting sufficient evidence of mitigation to satisfy the "some evidence" test. The trial judge should have given a jury instruction as to legally adequate provocation. The judge's contention that the instruction should not be given because the defendant was carrying a weapon was without legal basis or justification. The jury never was given an opportunity to weigh and consider whether the shooting stemmed from a hot-blooded response to legally adequate provocation.

## II

### Inconsistent Defenses

■ At trial, evidence of appellant's state of mind was elicited on his direct examination:

Q: How many times do you recall Mr. Roth hitting your head into the steps?

A: At least four.

Q: What did you think was occurring when this was happening?

A: I thought he was trying to kill me.

Q: Why did you think that?

A: Because he was banging my head into the steel steps.

. . . .

Q: Did you have any intention to kill Mr. Roth that night?

A: No, I did not.

Q: What was your intention when you pulled the gun?

A: Just to keep Mr. Roth from beating—beating me any more.

Appellant's trial counsel requested jury instructions on self-defense, imperfect self-defense, and hot-blooded response to legally adequate provocation. Assuming, arguendo, that rage and fear are inconsistent emotions, under Maryland law it is well settled that a defendant is allowed to present and argue inconsistent theories. "[A] defendant is entitled to have the jury instructed on any theory of defense that is fairly supported by the evidence, even if several theories offered are inconsistent." *Sims v. State,* 319 Md. 540, 550, 573 A.2d 1317 (1990). This proposition is consistent with the precept that "a defendant is entitled to an instruction on every essential question or point of law supported by evidence." *Id.* Allowing the advancing of inconsistent theories can raise "practical problems of proof" in that "different theories involve proof of different mental states on the part of the defendant." *Id.* at 551, 573 A.2d 1317.

While McKay's testimony indicated that he shot Roth in self-defense because he was afraid Roth was "trying to kill" him, McKay also argues he is entitled to a mitigation instruction on the theory that the shooting was a hot-blooded response to legally adequate provocation. In reviewing the testimony of the victim, the defendant, and two witnesses to the shooting, we note that the victim was the only person who testified that he did not slam McKay's head into the metal steps several times. If McKay was attacked, punched in the face, and his head pounded against the metal steps, as much of the testimony indicates, it is

reasonable that such actions would generate a considerable degree of emotion, including fear and/or rage. Additionally, the victim testified that McKay fired two shots, turned and ran 15 yards, then ran toward Roth, shouting, "Hell with this, I'm going to kill this son of a bitch," whereupon, he fired a third shot at the victim who lay on the ground.[6] It is not difficult to believe that such provocation would inflame the passions of a reasonable man and " 'tend to cause him to act for the moment from passion rather than reason.' " *Girouard*, 321 Md. at 539, 583 A.2d 718.

In sum, we hold that where, as here, although a criminal defendant testifies, asserting that he acted out of fear when inflicting injury on his accuser, the presiding judge must, when requested, give an instruction on heat of passion where other evidence supports such a theory.

JUDGMENTS REVERSED; CASE REMANDED FOR NEW TRIAL.

COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.

---

**6.** While this version, if believed by the jury, certainly would justify the jury's refusal to find that McKay acted in self-defense because of the excessive force used, it may nevertheless provide an appropriate factual predicate for the legal conclusion that the appellant acted in the heat of passion.